IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>TWIN PEAKS FINANCIAL SERVICES, INC. aka KENNETH C. TEBBS aka MNK INVESTMENTS, INC., and MNK INVESTMENTS.<br><br>Debtor. | **CORRECTED[1] MEMORANDUM DECISION AFFIRMING BANKRUPTCY COURT'S DECISION GRANTING TRUSTEE'S SUMMARY JUDGMENT MOTION** |
| DUANE H. GILLMAN, as Chapter 7 Trustee,<br><br>                Plaintiff-Appellee,<br>v.<br><br>CHRISTOPHER RUSSELL aka CHRIS RUSSELL, an individual,<br><br>                Defendant-Appellant. | Case No. 2:15-cv-00167-DN<br><br>District Judge David Nuffer |

This is an appeal from the bankruptcy court's decision granting Duane H. Gillman's ("Trustee") summary judgment motion and ruling that Appellant Christopher Russell profited in the amount of $441,008.97 from a Ponzi scheme carried out by Twin Peaks Financial Services, Inc. and MNK Investments (collectively "Debtor").[2] Jurisdiction to hear this appeal from a final judgment of the bankruptcy court exists under 28 U.S.C. § 158(a)(1). After examining the briefs

---

[1] This Corrected Memorandum Decision and Order only changes the June 6, 2016 Memorandum Decision and Order in one respect. Specifically, the Appellant's name on page one—"aka Christ Russell"—has been corrected to read "aka Chris Russell".

[2] Notice of Appeal and Statement of Election, docket no. 1, filed March 16, 2015.

and appellate record submitted by the parties, oral argument is unnecessary since the appeal may be readily decided on the written submissions.[3]

## BACKGROUND[4]

During the latter part of 2005, Mr. Russell was introduced to Kenneth C. Tebbs. Mr. Tebbs represented to Mr. Russell that he was the owner and principal of the Debtor and that the Debtor was a real estate development company which was in need of short term lending sources to provide financing it needed to complete the purchase of subdivided building lots which would be developed or resold by Twin Peaks. In reality, Mr. Tebbs operated the Debtor as a Ponzi scheme. In reliance on Mr. Tebbs' representations and assurances, beginning in the later part of 2005, Mr. Russell provided a significant amount of short term financing to Debtor.

On November 9, 2007, involuntary chapter 11 petitions were filed by certain creditors of Twin Peaks Financial Services, Inc. ("Twin Peaks") and MNK Investments ("MNK"). Orders for relief under chapter 11 were entered, and the cases were substantively consolidated[5] into case no. 07-25399. The consolidated cases were converted to chapter 7, and Duane H. Gillman was appointed trustee. A related case, *In re Kenneth C. Tebbs*, case no. 08-20546, was commenced on February 1, 2008, but that case was not consolidated into case no. 07-25399.

---

[3] *See* DUCivR 7–1(f).

[4] In addition to the filed briefs, the parties also separately filed copies of the administrative record with different bates numbers. In this decision, citation to the Administrative Record will be to Appellant's Attachments, and will be cited as "APP R."

[5] *See e.g., In re Circle Land & Cattle Corp.*, 213 B.R. 870, 875 (Bankr. D. Kan. 1997):

> The present Bankruptcy Code does not specifically authorize substantive consolidation. But the concept is alluded to in the Advisory Committee Note to Fed. R. Bankr.P. 1015. This rule permits *administrative* consolidation of two or more petitions pending in one court. The Committee Note recognizes *substantive* consolidation when it says: "Consolidation, as distinguished from joint administration, is neither authorized nor prohibited by this rule since the propriety of consolidation depends on substantive considerations and affects the substantive rights of the creditors of the different estates." FED.R.BANKR.P. 1015 Advisory Committee Note (1983).

On November 25, 2009, the Trustee commenced an adversary proceeding against Mr. Russell, alleging claims of preferential transfer under 11 U.S.C. § 547 (Count 1),[6] fraudulent transfer under 11 U.S.C. § 548 (Count 2),[7] and state law fraudulent transfer under 11 U.S.C. § 544(b) (Count 3)[8]. The Trustee sought to recover a judgment against Mr. Russell in the total amount of $441,008.97, which, according to the Trustee, represents the amount that Mr. Russell received in excess of his principal investment with the Debtor. During the adversary proceeding, the Bankruptcy Court determined that the Debtor operated a Ponzi scheme[9] and that the Debtor was at all times insolvent and engaged in business for which it had unreasonably small capital.[10]

On May 15, 2013, the Trustee filed a motion for summary judgment asking the Bankruptcy Court to, among other things, find that the funds Mr. Russell received were fraudulent transfers pursuant to 11 U.S.C. § 548. Mr. Russell opposed the motion, arguing that: (1) the Court should consider all of his transactions with Kenneth Tebbs because the actions were all part of a single fraudulent scheme; (2) the transfers were not made with the subjective intent to hinder, delay, and defraud creditors; and (3) the Debtor was part of Mr. Tebb's fraudulent scheme and that Mr. Russell had a fraud claim against the Debtor that provided him a valid defense to the Trustee's fraudulent transfer claim.

The Bankruptcy Court ruled that the excess of funds specifically deposited directly into the Debtor's account (totaling $441,008.97) constituted Ponzi scheme profits and were therefore

---

[6] On February 20, 2014, the Bankruptcy Court entered an Order Granting Summary Judgment on Count 1. *See* Judgment, docket no. 1-1, filed March 16, 2015.

[7] On September 30, 2014, the Bankruptcy Court entered an Order and Judgment Granting Trustee's Motion for Summary Judgment on Count 2. *See id.*

[8] The parties agreed to dismiss the Trustee's Count 3 claims. *See id*.

[9] APP R. at 340.

[10] *Id.* at 327.

avoidable as fraudulent transfers.[11] The Bankruptcy Court did not agree with Mr. Russell that it consider all of his transactions with Kenneth Tebbs as a single fraudulent scheme. The Court held that Mr. Russell's transactions with the Debtor and Kenneth Tebbs must be viewed separately.[12] The Bankruptcy Court also stated that upon a finding of a Ponzi scheme, the Ponzi presumption arises establishing the requisite intent to defraud.[13] And as for Mr. Russell's fraud claim defense, the Court stated that even assuming that Mr. Russell had a claim for fraud, his alleged fraud claim did not constitute "value" for purposes of 11 U.S.C. § 548.[14]

Mr. Russell sets forth the following arguments on appeal: (1) the Bankruptcy Court correctly ruled that the payments the Debtor made to Mr. Russell were payments on account of antecedent debt; (2) the Bankruptcy Court erred when it found that Mr. Russell received funds in excess of his undertaking; (3) the Hashimoto Report is incomplete and inadequate to support a claw back claim; and (4) at all times that Mr. Russell received funds from Twin Peaks, he had a substantial claim against Twin Peaks.[15] Each argument is discussed below.

## STANDARD OF REVIEW

In reviewing a bankruptcy court's grant of summary judgment, the district court reviews the case *de novo* applying the same legal standards used by the bankruptcy court,

---

[11] *Id.* at 347–349.

[12] *Id.* at 330.

[13] *Id.* at 331–332.

[14] *Id.* at 332–333.

[15] Appellant's Brief, docket no. 9, filed April 30, 2015.

namely Fed.R.Civ.P. 56(c).[16] "Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."[17]

## UNDISPUTED FACTS

The Bankruptcy Court's recitation of the relevant facts remain undisputed. Therefore, the undisputed facts set forth below are taken from the Bankruptcy Court's Memorandum Decision on Trustee's Motion for Summary Judgment on Count 2 of the Complaint.[18]

1. The Debtor was insolvent within the meaning of the Bankruptcy Code since the commencement of its operations and was engaged in a business for which it had unreasonably small capital.

2. The Debtor operated as a Ponzi scheme.

3. Between June 28, 2006 and October 13, 2006, the Debtor received transfers from the Defendant totaling $520,000.00.

4. In return for the $520,000.00 total investment, the Defendant was paid a total of $961,008.97 by the Debtor, thus allowing the Defendant to receive $441,008.97 more than he had invested with the Debtor.

5. On December 2, 2005, the Defendant transferred funds totaling $465,000.00 to Canyon View Title at the direction of Kenneth Tebbs.[19]

6. On December 7, 2005, the Defendant transferred funds totaling $100,000.00 to Canyon View Title at the direction of Kenneth Tebbs.

---

[16] *In re Stat-Tech Int'l Corp.*, 47 F.3d 1054, 1057 (10th Cir. 1995).

[17] *Id.*

[18] APP R. 328–29. Some minor edits have been made to improve readability without changing meaning.

[19] It appears that the transferred funds for December 2, 2005 should total $660,700. *See* APP R. 129 and 198. However, the exact amount of the transfers on December 2, 2005 is immaterial to the analysis.

5

7. On January 26, 2006, the Defendant transferred funds totaling $148,035.48 to Canyon View Title at the direction of Kenneth Tebbs. The $148,035.48 was loaned to an individual or entity other than the Debtor.

8. On January 27, 2006, the Defendant transferred funds totaling $151,900.00 to Canyon View Title at the direction of Kenneth Tebbs.

9. On February 2, 2006, the Defendant transferred funds totaling $145,000.00 to Canyon View Title at the direction of Kenneth Tebbs.

10. There is no evidence that the transfers of December 2, 2005, December 7, 2005, January 26, 2006, January 27, 2006, or February 2, 2006, benefited the Debtor.

11. Kenneth Tebbs is a separate individual and is not the Debtor, nor has the bankruptcy case *In re Kenneth Tebbs*, case no. 08-20546, been substantively consolidated into the Debtor's bankruptcy case.

## DISCUSSION

### 1. The Bankruptcy Court Did Not Err When It Found That Mr. Russell Received Funds In Excess Of His Undertaking

The Bankruptcy Court concluded that the transfers by the Debtor to Mr. Russell were voidable as fraudulent transfers under 11 U.S.C. § 548(a).[20] On appeal, Mr. Russell does not dispute that the elements of a fraudulent transfer claim pursuant to § 548(a) have been met. Instead, he takes issue with the Bankruptcy Court's construction of 11 U.S.C. § 548(c). Section 548(c) provides an affirmative defense to § 548(a). That section reads:

> Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the

---
[20] APP R. 334–335.

6

case may be, to the extent that such transferee or obligee *gave value to the debtor* in exchange for such transfer or obligation.[21]

Mr. Russell contends that the Bankruptcy Court was wrong in only considering what he invested with the Debtor and disregarding his investments with Mr. Tebbs—which totaled $1,725,635.48.[22] Section 548(c), however, specifically limits the affirmative defense to value given *to the debtor.* In the present case, the Debtor is Twin Peaks Financial Services, Inc. and MNK Investments. Mr. Tebbs has his own bankruptcy case which has not been substantially consolidated into the Debtor's bankruptcy case.

The Bankruptcy Court first accepted as an undisputed fact that Mr. Tebb's fraudulent scheme may have extended beyond the Debtor's business operations.[23] Thereafter it stated that "the fact that Tebb's fraudulent scheme may have extended beyond the Debtor's business operations does not automatically permit this Court to ignore Tebbs's and the Debtor's separateness."[24] The Bankruptcy Court went on to decide whether it should order substantive consolidation of the Debtor's and Mr. Tebb's bankruptcy cases. The Bankruptcy Court stated:

> "[S]ubstantive consolidation merges the assets and liabilities of the debtor entities into a unitary debtor estate."[25] A question central to the appropriateness of substantive consolidation is whether the economic prejudice of continued debtor separateness outweighs the economic prejudice of consolidation.[26] Tebbs's bankruptcy and the Debtor's bankruptcy have been pending for more than six years. The cases have not been substantively consolidated, and it would be inappropriate for this Court to ignore the separateness of these two debtors. The situation is akin to two individuals perpetuating a fraudulent scheme. Unless the cases of the two debtors are substantively consolidated, payments made to one debtor cannot also be deemed to be payments made to the other debtor. After a

---

[21] 11 U.S.C. § 548(c)(emphasis added).

[22] Appellant's Brief at 10–13.

[23] APP R. at 331.

[24] *Id.*

[25] *Id.* (citing WoburnAssociates v. Kahn (In re Hemingway Transp., Inc.), 954 F.2d 1, 11-12 (1st Cir. 1992)).

[26] *Id. (citing Reider v. FDIC (In re Reider)*, 31 F.3d 1102, 1106-07 (11th Cir. 1994)).

careful weighing of the prejudice and benefits to all creditors, the Court must observe the separateness of the Debtor and Tebbs.[27]

On appeal, Mr. Russell contends that the Bankruptcy Court's decision was incorrect for several reasons.[28] First, Mr. Russell states, somewhat incoherently, that "while the investments were guided by Tebbs, he had led Defendant to believe that all of the investments had been rolled over into property that Twin Peaks had purchased. Accordingly, when Defendant received the payments from the debtor, the Defendant had a contractual obligation from both the Debtor (as owner) and Tebbs (as guarantor)."[29] Mr. Russell expands on this argument in his reply.[30] There he cites to *Miller v. Wulf*[31] for the proposition that "at each instance that Russell received funds from Twin Peaks, he was a creditor of Twin Peaks, regardless of whether the claim was supported by a void (Ponzi scheme) contract, or for fraud."[32] He further states in his reply that "[t]he implication that Tebbs and Leading Edge were 'independent third parties' is a gross mischaracterization of the fact [*sic*]."[33]

Mr. Russell's first argument is without merit. The issue to be resolved is not whether he is a creditor of Twin Peaks or Mr. Tebbs; instead. the issue is whether Mr. Tebbs's estate should be considered a part of the Debtor's estate in order for Mr. Russell to claim all of his investments as an affirmative defense pursuant to § 548(c). The Bankruptcy Court determined that substantive consolidation of the Debtor's and Mr. Tebb's bankruptcy cases was not appropriate.

---

[27] *Id.*

[28] Appellant's Brief at 12–13.

[29] *Id.* at 13.

[30] Appellant's Reply Brief, docket no. 16, filed June 22, 2015.

[31] 84 F. Supp. 3d 1266, 1276 (D. Utah), aff'd, 632 F. App'x 937 (10th Cir. 2015).

[32] Appellant's Reply Brief at 5.

[33] *Id.* at 2.

8

Mr. Russell does not challenge that conclusion. And after de novo review the Bankruptcy Court's decision was correct.

Mr. Russell's second argument is that "because Tebbs and the Debtor were acting in concern [*sic*] to defraud Defendant, Defendant had an actionable fraud [claim] against both for the full amount of his investment."[34] This argument was rejected by the Bankruptcy Court.[35] For purposes of the summary judgement motion, the Bankruptcy Court assumed that Mr. Russell has a claim for fraud against the Debtor in the amount of $1,725,635.48.[36] The Bankruptcy Court analyzed whether Mr. Russell gave value in exchange for the transfers he received from the Debtor. First, the Bankruptcy Court noted that "value" is defined pursuant to § 548(d)(2)(A) as "property, or satisfaction . . . of a present or antecedent debt of the debtor . . . ."[37] The Bankruptcy Court then stated that "[t]he 'property' the Defendant gave—his investment—has already been taken into account, and the Defendant gave the Debtor no other 'property' in exchange for the Transfers."[38] The Bankruptcy Court pointed out that "the only value that Defendant can assert that he gave in exchange for the Transfers is the satisfaction of a present or antecedent debt—presumably his alleged fraud claim."[39] In determining whether Mr. Russell's alleged fraud claim constitutes value for purposes of § 548 and whether it was given in exchange for the transfers, the Bankruptcy Court held:

> Given the undisputed facts of the case, the Transfers were not given in exchange for satisfaction of the Defendant's alleged fraud claim. On the date of the Transfers, the Defendant had not asserted a fraud claim. The Transfers were made

---

[34] Appellant's Brief at 13.

[35] APP R. 332–333.

[36] *Id.* at 332.

[37] *Id.* at 333 (citing 11 U.S.C. § 548(d)(2)(A)).

[38] *Id.*

[39] *Id.*

pursuant to certain investment contracts promoted by the Debtor (Investment Contracts). There was no other reason for the Transfers, and the Defendant cannot now argue that the Transfers were made in exchange for satisfaction of his alleged fraud claim.[40]

On appeal, Mr. Russell contends that under the principles recognized in *Wulf*, "Defendant has a fraud claim against all of the relevant co-conspirators and all payments that Defendant received from the Debtor up to the principal amount of its fraud claim was received for value under § 548(c)."[41] Mr. Russell cites to the following statement in *Wulf* in support of his contention: "All transfers which exceed the amount of an investor's investment are considered 'fictitious profits' and are not made for 'value' because they exceed the scope of the investors' fraud claim against the perpetrator of the Ponzi scheme."[42]

*Wulf* was a Ponzi scheme case in which the receiver appointed by the court sought to recover fraudulent transfers made by the Ponzi scheme operator to a former investor. The former investor argued that he was not a defrauded investor but a disgruntled stockholder who should not be held liable for the payments he received in excess of his initial investment.[43] Mr. Russell's quoted language was in response to the former investor's argument that there is a distinction in a fraudulent transfer claim between money invested as debt and money invested as equity. *Wulf* held that there is no such distinction, that all investors in a Ponzi scheme are defrauded creditors and that "[a]ll transfers which exceed the amount of an investor's investment are considered 'fictitious profits' and are not made for 'value'. . . ."[44] *Wulf* did not consider whether an

---

[40] *Id.*

[41] Appellant's Brief at 9.

[42] *Wulf,* 84 F. Supp. 3d at 1275.

[43] *Id.* at 1276.

[44] *Id.* at 1275.

10

unasserted fraud claim can serve as "value." The Bankruptcy Court's conclusion that Mr. Russell's alleged fraud claim does not constitutes value for purposes of § 548(c) is affirmed.

2. **Not All Payments Made by the Debtor To Mr. Russell Were Payments On Account Of Antecedent Debt**

Mr. Russell contends that "the Debtor incurred an antecedent debt" to him based on "the proceeds from his investments [which] had been rolled over into loans to the Debtor . . . ."[45] According to Mr. Russell, "[a]lthough some of the initial funds that Defendant had invested through Tebbs were invested in property purportedly owned by Leading Edge, at Tebbs request, the Defendant agreed to roll over the 'proceeds' from those investments into other investments managed by Tebbs."[46] Mr. Russell argues that "[b]y purporting to have received funds 'rolled over' from other investments, the Debtor incurred an antecedent debt to Defendant, regardless of whether the purported rollover occurred or was a sham."[47] He further states that "[t]he Debtor acquired its obligation not only when it received funds directly from the defendants, but when it purported to receive funds that constituted the proceeds of Defendant's prior investments."[48]

Section 548(c), defining an affirmative defense, places the burden on Mr. Russell to identify or produce evidence sufficient to create a genuine dispute of material fact as to whether the investments Mr. Russell made to other non-Debtor parties ultimately created an antecedent debt owed by the Debtor to Mr. Russell. Mr. Russell's efforts fail for two reasons. First, there is no evidence that the funds were "rolled over" to the Debtor; Mr. Russell simply states that "the Debtor incurred an antecedent debt . . . regardless of whether the purported rollover occurred or

---

[45] Appellant's Brief at 9–10.

[46] *Id.* at 9.

[47] *Id.* at 10.

[48] *Id.* at 16.

was a sham."[49] This is insufficient to create a genuine dispute of material fact. Second, Mr. Russell's argument that "proceeds" were reinvested fails for an even more basic reason. It is undisputed that the Debtor operated as a Ponzi scheme. Even if there was evidence that the Debtor "receive[d] funds that constituted the proceeds of Defendant's prior investments[,]" those proceeds constitute fictitious profits. The law is clear that a defendant gives value to the debtor up to his original investment, while transfers in excess of the defendant's undertaking are not considered value.[50]

### 3. Public Policy Supports Clawback of Amounts Transferred to Mr. Russell in Excess of His Undertaking with the Debtor

Mr. Russell on appeal reasserts his public policy argument.[51] In a single disjointed paragraph, Mr. Russell states that

> by separating and isolating the Debtor from the broader Ponzi scheme, the Bankruptcy Court ignored the underlying public policy that allows for claw backs. That policy expressed by this Court in *Independent Clearinghouse*[52] allows the court to recover "fictitious profits" secured at the expense of other investors. Defendant did not profit from the Ponzi scheme.[53]

It appears the parties do not dispute that Mr. Russell has lost a significant amount of money through his investments with the Debtor and other non-Debtor parties. This is tragic. However, as previously stated by the Bankruptcy Court and affirmed by this ruling, substantive consolidation of the Debtor's and Mr. Tebb's bankruptcy cases is not appropriate. The Trustee's opposition correctly points out:

---

[49] *Id.* at 10.

[50] *Wulf*, 84 F. Supp. 3d at 1274.

[51] Appellant's Brief at 13.

[52] *In re Indep. Clearing House Co.*, 77 B.R. 843, 881 (D. Utah 1987).

[53] Appellant's Brief at 13.

> If Russell is given credit for the value that he provided to third parties and is allowed to keep the money he received from the Debtor in excess of his investments *with the Debtor* itself, then the money invested by other investors in the Debtor's Ponzi scheme is being used to compensate Russell for investment losses that Russell suffered with investments he made with other entities that never, as far as Russell has been able to demonstrate, benefitted the Debtor.[54]

Accordingly, requiring Mr. Russell to repay amounts he received in excess of his original investment with the Debtor does not violate the public policy behind the Trustee's clawback powers.

### 4. The Hashimoto Report

The Trustee employed Mark D. Hashimoto as an expert and the Estate's accountant to investigate the Debtor's finances in the two years prior to the petition date.[55] Mr. Hashimoto reviewed documentation in order to formulate his opinion and thereafter issued an expert report.[56] Mr. Hashimoto found that of the ten transfers Mr. Russell claims to have made to the Debtor, "[t]he Debtor's financial and accounting records confirm that the Debtor received the last three of the transfers . . . ."[57] Mr. Hashimoto asserted that "[t]he Debtor's financial and accounting records do not reflect that the Debtor received any other transfers from Defendant, including the first seven transfers that Defendant claims to have made . . . ."[58] The last three paragraphs of his affidavit, Mr. Hashimoto explains the reasons for his findings.

> 8. The wire confirmations attached as Exhibit A to the Russell Declaration relating to the two transfers in the amount of $195,000.00 each made on December 2, 2005 confirm the transfer of the funds to Canyon View Title, and do not reference the Debtor in any way.

---

[54] Appellee's Brief at 10, docket no. 12, filed May 27, 2015.

[55] Supplemental Declaration of Mark D. Hashimoto in Support of Plaintiff's Motion for Summary Judgment Against Defendant Christopher Russell, APP R. 198, docket no. 9-3, filed April 30, 2015.

[56] *Id.*

[57] *Id.*

[58] *Id.*

9. The wire instructions attached as Exhibit A to the Russell Declaration relating to the transfer of $270,700.00 on December 2, 2005 do not indicate whether or not the wire transfer was actually made. In addition, the instructions are to transfer funds to Canyon View Title, and do not reference the Debtor in any way.

10. Finally, the transfers referenced in the Russell Declaration in the amounts of $100,000.00, $148,035.48, $151,900.00 and $145,000.00 are only supported by documentation consisting of the first page of instructions to Countrywide Bank to transfer funds. The supporting documentation provided in the Russell Declaration does not indicate the destination or beneficiary of the purported wire transfers, or whether or not the transfers were actually made.[59]

Based on the record of the adversary proceeding, the Bankruptcy Court found it an undisputed fact that there is no evidence that the transfers of December 2, 2005, December 7, 2005, January 26, 2006, January 27, 2006, or February 2, 2006, benefited the Debtor.[60]

Mr. Russell argues that "[a]ssuming this Court holds that Defendant's profit can be measured in isolation, the debtor failed to introduce competent evidence intended to measure the actual extent of payments that the Debtor received from the Defendant."[61] Mr. Russell makes two arguments to invalidate Mr. Hashimoto's report.

First, Mr. Russell argues that the report "looked solely at checks directly received from Defendant, and did not contemplate or account for the fact that Twin Peaks obtained funds from Defendant indirectly through the [*sic*] were paid to the escrow account maintained by Canyon View Title."[62] As an example, Mr. Russell points to an exhibit previously filed in the adversary proceeding. This exhibit, according to Mr. Russell,

> reflects that Canyon View paid to the Debtor the sum of $100,003.00 on January 4, 2006, on an escrow file pertaining to property located at 12562 Starlite Hill Lane in Herriman, Utah. However, a month earlier, at Tebbs' direction, Defendant

---

[59] *Id.* at 199; s*ee also* APP R. 133–146.

[60] APP R. 329.

[61] Appellant's Brief at 14.

[62] *Id.* at 13–14.

14

wired to Canyon View the sum of $100,000 ostensibly to provide the funding for a loan to be secured by property referred to as the Starlite property.[63]

The exhibit, however, does not support an inference that Mr. Russell gave value to the Debtor indirectly. The only evidentiary support that Mr. Russell has provided to show a link between the $100,003 check from Canyon View to the Debtor and the $100,000 that Mr. Russell wired to Canyon View a month earlier is his own self-serving declaration.[64] The documents Mr. Russell cites to in support of his claim do not reference a 'Starlite' property.[65] Mr. Russell cannot create a genuine issue of material fact based on unsupported assumptions.

Mr. Russell also argues that Mr. Hashimoto's report is incomplete because the report "does not determine what happened to the proceeds from Defendant's collateral."[66] The "proceeds" argument has already been addressed and rejected *supra.*

## ORDER

For the reasons stated above, IT IS HEREBY ORDERED that the ruling of the Bankruptcy Court is AFFIRMED in its entirety. Mr. Russell is ordered to remit $441,008.97, plus pre-judgment interest and post-judgment interest at the federal rate applicable pursuant to 28 U.S.C. § 1961(a).[67] The Clerk shall close this case.

Dated June 6, 2016.

BY THE COURT:

_David Nuffer_
David Nuffer
United States District Judge

---

[63] *Id.* at 14.

[64] *See* APP R. 238.

[65] *See Id.* 251-254.

[66] Appellant's Brief at 14.

[67] *See* Judgment, docket no. 1-1, filed March 16, 2015.

15